1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   ED HARTMAN, et al.,                        CASE NO. C11-1753JLR

11                    Plaintiffs,               ORDER GRANTING IN PART
                                                AND DENYING IN PART
12            v.                                DEFENDANT'S MOTION FOR
                                                SUMMARY JUDGMENT AND
13   UNITED BANK CARD INC., et al.,             DENYING PLAINTIFFS'
                                                MOTION FOR CLASS
14                    Defendants.               CERTIFICATION

15                        I.      INTRODUCTION

16          Before the court are (1) Defendant United Bank Card, Inc.'s ("UBC") motion for

17   summary judgment (SJ Mot. (Dkt. # 42)), and (2) Plaintiffs Ed Hartman, Janet Hodgin,

18   and Michael Hodgin's motion for class certification (Class Cert. Mot. (Dkt. # 36)).

19   Defendant International Payment Systems, Inc. (IPS") has joined UBC's motion for

20   summary judgment in part as described below.  (Joinder (Dkt. # 58) at 1.)  The court has

21   reviewed both motions, all submissions filed in support and opposition thereto, and the

22   applicable law.  Having heard oral argument with respect to both motions on October 3,

2012, and being fully advised, the court GRANTS in part and DENIES in part UBC's

motion for summary judgment and DENIES Plaintiffs' motion for class certification.

## II.      BACKGROUND

UBC sells and leases point of sale credit card payment equipment to merchants

that use the equipment to process their customers' payments and other transactions.  (*See*

Ward Decl. (Dkt. # 44) ¶¶ 2-3.)  UBC engages Independent Sales Organizations ("ISOs")

to locate merchants who might have an interest in UBC's products and services and to

sell those products and services to those merchants.  (Jones Decl. (Dkt. # 45) ¶ 2.)  UBC

engaged IPS as one of its ISOs.  (*See* Hickey Decl. (Dkt. # 46) ¶¶ 2-3.)  All of UBC's

ISO's are required to sign UBC's ISO Agreement.  (*See* Jones Decl. ¶¶ 4-6.)

On February 1, 2007, UBC and IPS entered into an ISO agreement.  (*See*

Williamson Decl. (Dkt. # 61) Ex. D; Joint Decl. (Dkt. # 37) Ex. J.)  UBC does not have

an exclusive relationship with its ISOs.  (Jones Decl. ¶ 7.)  Under the terms of the ISO

agreement, IPS is free to engage other projects.  (*Id.*)   In addition, the ISO agreement

recites that "UBC and [IPS] will be deemed to be independent contractors and will not be

considered to be agent, servant, joint venturer or partner of the other."  (Williamson Decl.

Ex. D ¶ 10.8; Joint Decl. Ex. I ¶ 10.8.)  The ISO agreement also states that IPS promises

to perform is contractual duties in compliance with "all applicable state and federal laws

and regulations."  (*Id.* ¶ 6.1(c).)

In the ISO Agreement, IPS further agrees to comply with all written procedures

and requirements issued by Visa and MasterCard.  (*Id.* ¶ 6.1(c) & § I (definition of

"Rules").)  Visa and MasterCard impose strict rules on the financial institutions or banks

1  with whom they contract, and they also require those financial institutions or banks to

2  impose those same rules on the merchants who submit transactions for processing and on

3  the entities that process those transactions.  *See In re Heartland Payment Sys., Inc.*

4  *Customer Data Sec. Breach Litig.*, 834 F. Supp. 2d 566, 574-75 (S.D. Tex. 2011).

5  Although UBC does not directly contract with Visa or MasterCard, it is required to

6  follow Visa and MasterCard's rules through its contract with First National Bank of

7  Omaha ("the Bank"), which does have a direct relationship with Visa and MasterCard.

8  (Ward Decl. ¶¶ 6-7.)  In turn, UBC requires IPS to likewise abide by the Visa and

9  MasterCard rules through its ISO Agreement.  (Williamson Decl. Ex. D ¶ 6.1 & § I; Joint

10  Decl. Ex. I ¶ 6.1(c) & § I.)

11      Pursuant to Visa's and MasterCard's rules, any entity that wishes to market under

12  its own name must register with a financial institution and pay an annual fee.  (*See* Ward

13  Decl. ¶¶ 6-7.)  UBC pays an annual fee of $10,000.00 to the Bank, which enables it to

14  market its product and services related to Visa and MasterCard under its own name.  (*Id.*

15  ¶ 7.)  The vast majority of ISOs, including the ISOs that contract with UBC, are not

16  registered with any financial institution.  (*Id.* ¶ 8.)  Accordingly, UBC's ISOs, including

17  IPS, must identify themselves as UBC in any communication with merchants or

18  consumers.  This stricture exists as a result of the cascading contractual requirements that

19  originate with Visa and MasterCard and are passed down to IPS through Visa and

20  MasterCard's contract with the Bank, the Bank's contract with  UBC, and ultimately

21  UBC's ISO Agreement with IPS.  (*See id.* ¶¶ 8-9; Hickey Decl. ¶ 6; Sullivan Decl. (Dkt.

22  # 43) Ex. C (Shoger Dep.) at 15:15-18.)

1    UBC does not require an ISO to use particular marketing materials but does make

2    certain marketing materials available to ISOs on its Interactive ISO System, which is

3    sometimes referred to as the "Portal."  (Jones Decl. ¶ 10; Sullivan Decl. Ex. C at 17:17-

4    18:4.)  One document on the Portal, entitled "Keys to Telemarketing Success," describes

5    autodialing marketing, and states that "[a]utomated dialing can dramatically increase the

6    productivity of any outbound telemarketing operation."  (Williamson Decl. Ex. A at 1;

7    *see* SJ Mot. at 13, n.4 (UBC acknowledges that the document was placed on the portal).)[1]

8    When IPS was formed, its founders intended to use automatic dialing devices as

9    one means of recruiting merchants.  (Sullivan Decl. Ex. C. at 20:17-24.)  In April 2007,

10   IPS entered into a contract with ConnecTel, which provided a platform for IPS to

11   automate their marketing telephone calls through the use of automatic dialing and

12   announcing devices on ConnecTel's website.  (Peralta Decl. (Dkt. # 38) ¶¶ 2-3, Ex. A.)

13   IPS was a client of ConnecTel for about two years.  (Supp. Peralta Decl. (Dkt. # 53) ¶ 3.)

14   IPS utilized ConnecTel's automatic telephone dialing services to reach telephone

15   numbers of businesses (and potential customers) nationwide.  (*See* Shoger Decl.

16   (Dkt. # 50) ¶ 2.)

17   During its relationship with ConnecTel, IPS was able to log onto ConnecTel's

18   website, download telephone numbers to which a prerecorded message would be sent

19   using an automatic dialing and announcing device, and assign a script for the message

20   _____

21   [1] UBC asserts in its motion for summary judgment that "IPS never saw . . . this
     document."  (SJ Mot. at 13, n. 4 (citing Sullivan Decl. Ex. C at 53:2-54:20.).)  UBC's citation to
22   the record, however, does not support this assertion.  (*See id.*)

1 that would be played if the call was answered.  (*See* Peralta Decl. ¶ 3; Sullivan Decl. Ex.

2 C at 30:2-31:4.)   IPS was able to set calling parameters using ConnecTel's platform so

3 that different messages were played depending on whether a live person or a machine

4 answered the telephone call.  (Supp. Peralta Decl. ¶ 7.)  If one of IPS's calls reached a

5 voicemail or answering machine, IPS (using an automatic dialing device through

6 ConnecTel) would leave a message asking the recipient to return the call to discuss ways

7 UBC might assist the recipient business.  (Sullivan Decl. Ex. C at 30:21-31:8; 32:10-20.)

8 These messages always stated that the call was from UBC, not IPS.  (*Id.* at 31:5-8.)  If a

9 live person answered the phone, IPS set the calling parameters so that a message would

10 play that contained no sales information, but simply apologized and terminated the call.

11 (*Id.* at 33:4-34:10; *see* Beard Decl. (Dkt. # 56) ¶ 3 (stating that a disc produced by

12 ConnecTel of recordings related to IPS's calling activity included a recording that simply

13 stated: "Oops, wrong number.").)

14         ConnecTel tracks certain information with regard to users' calling activity,

15 including telephone numbers dialed, dates and times of calls, and copies of any audio

16 recordings played for connected calls.  (Supp. Peralta Decl. ¶ 6.)  ConnecTel employs

17 answer detection software that attempts to determine whether a call is answered by a live

18 person, answered by an answering machine or voicemail, or not answered or

19 disconnected.  (*Id.* ¶ 8.)  The answer detection software is not fool-proof and sometimes

20 fails to correctly identify how a call was answered.  (*Id.* ¶ 9.)  ConnecTel lacks

21 information and records sufficient to determine which calls IPS placed through its calling

22 platform were answered by a person or a machine.  (*Id.* ¶¶ 10, 12.)

1      In response to a subpoena from Plaintiffs, ConnecTel produced a spreadsheet of

2  calls that IPS placed through ConnecTel's platform.[2]  (*Id.* ¶ 12.)  According to

3  descriptions provided to the court, the spreadsheet contains a list of all of the calls placed

4  by IPS with no indication of which calls were answered by a live person or by a machine.

5  (*Id.*)  ConnecTel lacks records sufficient to determine which calls placed by IPS through

6  ConnecTel's platform were answered by a person and which were answered by a

7  machine.  (*Id.*)  In addition to the spreadsheet, ConnecTel also provided audio recordings

8  of scripts associated with IPS's calling activity.[3]  (*Id.* ¶ 11; Peralta Decl. (Dkt. # 38) ¶ 4.)

9      According to Plaintiffs' counsel, their review of data provided by ConnecTel

10  indicates that IPS made approximately 110,000 calls to telephone numbers with

---

12      [2] Despite Plaintiffs' counsel's statement that their "[d]eclaration attaches the relevant
13  records for the Court to review" (*see* Reply to Class Cert. Mot. (Dkt. # 64) at 3-4), Plaintiffs have
not provided for the court a copy of the underlying data or spreadsheet that was produced by
ConnecTel in response to Plaintiffs' subpoena and that Plaintiffs' counsel reviewed, or even a
14  portion of the spreadsheet, to the court.  (*See generally* Joint Decl.)

15      [3] According to counsel, in response to Plaintiffs' subpoena, ConnecTel produced a disc
with audio recordings associated with IPS's calling activity.  (*See* Joint Decl. ¶ 15; Peralta Decl.
16  (Dkt. # 38) ¶ 4, Ex. B; Supp. Peralta Decl. (Dkt. # 53) ¶11; Supp. Sullivan Decl. (Dkt. # 55) ¶ 2.)
The disk contained 26 separate recordings.  (*See id.* ¶ 3; Beard Decl. (Dkt. # 56) ¶ 2.)  Nine of
17  these recordings sound like live sales conversations between representatives of Dish Network
and potential customers, and do not mention UBC.  (Beard Decl. ¶ 4.)  UBC asserts that as a
18  result of these Dish Network recordings, there is no way to tell which calls on the spreadsheet are
related to IPS calls on behalf of UBC and which are related to IPS calls on behalf of Dish
19  Network.  The court, however, notes that nowhere does IPS discuss any calls that it may have
made on behalf of Dish Network.  (*See generally* IPS Resp. (Dkt. # 49).)  The court, therefore, is
uncertain what to make of the Dish Network calls.  If IPS had made calls on behalf of Dish
20  Network, the court would have expected IPS to discuss this issue in their responsive
memorandum or the declarations IPS submitted.  Absent some indication from IPS that some of
21  the calls listed on the spreadsheet relate to calls that IPS made on behalf of Dish Network, the
court declines to rely on IPS's purported Dish Network calls as a basis for any portion of its
22  order.

ORDER- 6

Washington prefixes.[4]  (Joint Decl. ¶ 15.)  Due to the prevalence of new technology in the telecommunications industry which creates portable telephone numbers, such as call forwarding, VoIP (voice over internet protocol) telephones, Google Voice, Skype, or Magic Jack, IPS cannot know with certainty where the business owners it called were physically located at the time it made the calls.  (*See* Shoger Decl. ¶ 2; Sullivan Decl. Ex. C (Shoger Dep.) 45:11-25; *see also* IPS Resp. (Dkt. # 49) at 4.)

Mr. Hartman alleges that his business telephone line for The Drum Exchange received calls from IPS on behalf of UBC, on February 23, 2010 and March 15, 2010. (2d Am. Compl. (Dkt. # 47) ¶ 3.2; Sullivan Dep. Ex. E (Hartman Dep.) at 17:15-25.)  Mr. Hartman asserts that both calls left messages on The Drum Exchange's voicemail.  (*Id.* at 18:1-7.)  The messages identified the caller as a representative of UBC, offered "low rates and brand new equipment for accepting credit card payments," and left a phone number for Mr. Hartman to call.  (2d Am. Compl. ¶ 3.2.)  Mr. Hodgins and Ms. Hodgins make similar allegations, claiming that IPS, on behalf of UBC, called the telephone for their business, Kids Northwest, on March 17, 2010, and left an identical message.  (*Id.* ¶ 3.3; Sullivan Decl. Ex. F (Hodgin Dep.) at 15:23-24.)

---

[4] Plaintiffs admit that this number is "slightly high."  (Class Cert. Mot. (Dkt. # 36) at 4 n.1.)  In fact, Plaintiffs admit that they did not count every phone number on the spreadsheet with Washington State area codes, but rather every phone number in which "206," "253," "509," "360," or "425" appeared anywhere within the 10-digit phone number.  (*See id.*)  In their motion for class certification, Plaintiffs represented that they would "refine" this number in their reply memorandum (*see id.*), but there is no indication that they did (*see generally* Class Cert. Reply (Dkt. # 64) at 2).

ORDER- 7

1    Qwest charges Mr. Hartman a flat monthly rate for The Drum Exchange's

2  telephone service, which includes voicemail service.  (Sullivan Decl. Ex. E at 33:25-

3  35:1.)  The flat rate does not increase regardless of the number of calls or voicemails that

4  The Drum exchange receives.  (*See id.* at 35:2-5.)  Kids Northwest uses an answering

5  machine (not voicemail).  (*Id.* Ex. F at 18:19-19:5.)  Qwest charges Kids Northwest a flat

6  fee for its business telephone line and did not charge Kids Northwest any additional

7  amount for receipt of the call at issue.  (*Id.* at 32:16-35:6.)

8    Plaintiffs have asserted claims for (1) violation of Washington's statute restricting

9  the use of automatic dialing and announcing devices ("WADAD"), RCW 80.36.400 (*see*

10  2d Am. Compl. ¶¶ 5.1-5.3), (2) violation of Washington's Consumer Protection Act

11  ("CPA"), RCW ch. 19.86 (*see id.* ¶¶ 6.1-6.3), (3) declaratory relief under RCW 7.24.010

12  (*see id.* ¶¶ 7.1-7.3), and (4) negligence (*see id.* ¶¶ 8.1-8.3).  Plaintiffs define their

13  proposed class as follows:

> All Washington residents who received one or more commercial
> solicitations from UBC directly or through its agents, including but not
> limited to IPS, through the use of an automatic dialing and announcing
> device.

14

15

16

(Class Cert. Mot. at 1; 2d Am. Compl. ¶ 4.2.)

17
### III.    ANALYSIS

18
### A.  UBC'S Motion for Summary Judgment

19    UBC has moved for summary judgment with respect to all of Plaintiffs' claims.

20  (*See generally* SJ Mot.)  First, UBC asserts that it is entitled to summary judgment with

21  respect to Plaintiffs' WADAD claim because IPS, and not UBC, placed the calls at issue.

22

1  UBC asserts that it cannot be held to be vicariously liable for IPS's calling activity

2  because IPS is neither its actual nor ostensible agent.  (*See id.* at 8-14.)  Second, UBC

3  asserts that Plaintiffs are not entitled to recover under the WADAD because they suffered

4  no actual damages.  (*See id.* at 14-17.)  Third, UBC argues that Plaintiffs' declaratory

5  judgment and CPA claims should be dismissed because they rely solely upon Plaintiffs'

6  arguably defective WADAD claim.  (*See id.* at 17-18.)  Fourth, UBC asserts that

7  Plaintiffs' negligence claim should be dismissed because Plaintiffs admit that they have

8  suffered no actual damages.  (*See id.* at 18.)   Finally, UBC asserts that all of Plaintiffs'

9  claims should be dismissed because they lack standing under Article III of the United

10  States Constitution.  (*See id.* at 18-19.)

11          IPS joins those portions of UBC's motion which assert that (1) Plaintiffs cannot

12  recover under the WADAD because Plaintiffs suffered no actual injuries, and (2)

13  Plaintiffs cannot recover under their CPA or declaratory judgment claims because these

14  claims rely upon Plaintiffs' allegedly defective WADAD claim.  (Joinder at 1-2.)

15  Plaintiffs oppose UBS's motion in its entirety.  (SJ Resp. (Dkt. # 60).)

16          **1.  Summary Judgment Standards**

17          Summary judgment is appropriate if the evidence, when viewed in the light most

18  favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

19  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

20  P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*, 477

21  F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

22  there is no genuine issue of material fact and that he or she is entitled to prevail as a

1  matter of law.  *Celotex*, 477 U.S. at 323.  "Where the non-moving party bears the burden

2  of proof at trial, the moving party need only prove that there is an absence of evidence to

3  support the non-moving party's case."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387

4  (9th Cir. 2010) (international citations omitted).  If the moving party meets his or her

5  burden, then the non-moving party "must make a showing sufficient to establish a

6  genuine dispute of material fact regarding the existence of the essential elements of his

7  case that he must prove at trial" in order to withstand summary judgment.  *Galen*, 477

8  F.3d at 658.

9        **2.   Vicarious Liability**

10        It is undisputed that UBC did not make the telephone calls at issue directly.

11  Instead, UBC contracted with IPS to market UBC's services, and IPS subsequently

12  initiated the telephone calls using an automatic dialing and announcing device.  In

13  making the calls, IPS expressly identified itself as UBC.  Indeed, IPS was required to

14  identify itself as UBC due to requirements contained within UBC's ISO Agreement.  The

15  court rejects UBC's assertion that because it did not place the calls itself it cannot be held

16  liable under the WADAD for "use" of "an automatic dialing and announcing device for

17  purposes of commercial solicitation."  (*See* SJ Mot. at 8-9 (citing RCW 80.36.400(2)).)

18  Although "[n]o Washington [State] court has determined whether [the WADAD]

19  encompasses agency liability[,] . . . the court finds persuasive the rationale of other courts

20  that recognize vicarious liability in the context of similar statutory schemes."  *Spaford v.*

21  *Echostar Commc'ns Corp.*, No. C06-479JLR, 2007 WL 2055838, at *1 (W.D. Wash.

22  July 16, 2007) (citing *Accounting Outsourcing, LLC v. Verizon Wireless Pers. Commc'n,*

*L.P.*, 329 F. Supp. 2d 789, 806 (M.D. La. 2004) (finding vicarious liability under federal Telephone Consumer Protection Act where advertisers hired third-parties to fax unsolicited advertisements in contravention of statute)). Accordingly, if UBC is to be found liable for violation of the WADAD, Plaintiffs must establish the violation through some form of agency or vicarious liability.

UBC asserts that it cannot be held vicariously liable for IPS's acts because (1) it did not retain sufficient control over IPS's marketing activities to create an actual agency relationship (SJ Mot. at 9-13), and (2) IPS had no apparent authority to act as UBC's ostensible agent. (SJ Mot. at 13-14.) An agent's authority to bind its principal may be either actual or apparent. *King v. Riveland*, 886 P.2d 160, 165 (Wash. 1994); *Hoglund v. Meeks*, 170 P.3d 37, 44 (Wash. Ct. App. 2007); *see also* D. DeWolf, K. Allen, 16 Wash. Prac. Tort Law and Practice § 3.18 (3d ed. 2006). "Whether an agency relationship exists is generally a question of fact for the jury." *Unruh v. Cacchiotti*, 257 P.3d 631, 638 (Wash. 2011.)

Express actual agency requires control of the agent by the principal. *See Bain v. Metro. Mortg. Grp., Inc.*, --- P.3d ---, 2012 WL 3517326, at *11 (Wash. Aug. 16, 2012). UBC argues that, because the IPO Agreement recites that "UBC and ISO will be deemed to be independent contractors and will not be considered to be agent, servant, joint venture, or partner of the other," and because UBC did not require IPS to market UBC's products and services in any particular manner, UBC lacked the requisite control over IPS for an actual agency relationship to arise. (*See* SJ Mot. at 12-13.) There is, nevertheless, a variant of actual authority – implied actual authority – that UBC did not

1  address in its motion.  As discussed below, this variant of actual authority may be

2  applicable in this case and prevents the court from granting summary judgment in favor

3  of UBC on this issue.

4       "Implied authority is actual authority, circumstantially proved, which the principal

5  is deemed to have actually intended the agent to possess."  *King*, 886 P.2d at 165.

6  Implied actual authority depends upon objective manifestations made by the principal to

7  the agent.  *Id.*  "The manifestations to the agent can be made by the principal directly, or

8  by any means intended to cause the agent to believe that he is authorized or which the

9  principal should realize will cause such belief."  *Blake Sand & Gravel, Inc. v. Saxon*, 989

10  P.2d 1178, 1181 (Wash. Ct. App. 1999) (quoting Restatement (Second) of Agency § 26

11  cmt. b, at 101 (1958)).  Actual authority to perform certain services on a principal's

12  behalf results in implied authority to perform the usual and necessary acts associated with

13  the authorized services.  *Hoglund*, 170 P.3d 37, 44 (Wash. Ct. App. 2007) (citing *Larson*

14  *v. Bear*, 230 P.2d 610, 613 (Wash. 1951)).  As the Washington Supreme Court has

15  articulated:

16       [T]he principal is bound by the act of his agent when he has placed the
        agent in such position that persons of ordinary prudence, reasonably

17       conversant with business usages and customs, are thereby led to believe and
        assume that the agent is possessed of certain authority, and to deal with him

18       in reliance upon such assumption.

19  *Hoglund*, 170 P.3d at 44 (quoting *Mohr v. Sun Life Assurance Co. of Canada*, 89 P.2d

20  504, 505 (Wash. 1939)).

21       Despite the recitation in the IPO Agreement disclaiming the creation of an agency

22  relationship, UBC acknowledges that IPS was authorized to market UBC's products and

ORDER- 12

1    services and that IPS was required by UBC's IPO Agreement to represent itself as UBC

2    to the recipients of those marketing efforts.  In addition, Plaintiffs point to the document

3    on UBC's portal generally promoting the use of autodialing as a marketing tool to its

4    ISOs, including IPS.  Whether these circumstances are sufficient to create an implied

5    actual agency with respect to the telephone calls at issue here, such that UBC could be

6    found vicariously liable for the calls placed by IPS, is a question of fact reserved for the

7    jury.

8         In addition to implied actual agency, the court considers the doctrine of apparent

9    or ostensible agency.  UBC also asserts that it is entitled to summary judgment with

10   respect to this theory of vicarious liability.  (*See* SJ Mot. at 13-14.)  "An agent has

11   apparent authority to act for a principal only where the *principal* makes objective

12   manifestations of the agents' authority to a third person."  *Ranger Ins. Co. v. Pierce*

13   *Cnty.*, 192 P.3d 886, 890 (Wash. 2008) (italics in original; internal quotations and citation

14   omitted).  Manifestations of authority by the purported agent do not establish apparent

15   authority to act.  *Id.* at 891.  In other words, "[a]pparent authority may be inferred only

16   from the acts of the principal, not from the acts of the agent."  *Hansen v. Horn Rapids*

17   *O.R.V. Park of the City of Richland*, 932 P.2d 724, 728 (Wash. Ct. App. 1997).[5]  Because

18   UBC did not communicate with Plaintiffs directly, UBC asserts that it could not have

19   made any "objective manifestations" to Plaintiffs concerning IPS's apparent authority.

20   _____

21        [5] In addition, the manifestations must cause the third party to actually, or subjectively,
     believe that the agent has authority to act for the principal, and the third party's subjective belief

22   must also be objectively reasonable.  *Hansen*, 932 P.2d  at 727.

1    UBC, however, misunderstands Washington law with respect to apparent authority

2    or ostensible agency.  For the doctrine to come into play, it is not necessary for UBC to

3    communicate directly with Plaintiffs.  Rather, such "objective manifestations" to third-

4    parties can arise "directly from the principal" or "from authorized statements of the

5    agent."  *Smith v. Hansen, Hansen, & Johnson, Inc.*, 818 P.2d 1127, 1133 (Wash. Ct. App.

6    1991).  Here, there is no dispute that contract provisions contained within UBC's ISO

7    Agreement required IPS to identify itself as UBC in all of its marketing activities on

8    behalf of UBC.  It is a question for the jury whether these facts are sufficient to create

9    apparent authority or an ostensible agency between UBC and IPS such that UBC would

10   be vicariously liable for the telephone calls at issue here.[6]  Accordingly, the court denies

11   UBC's motion for summary judgment with respect to the issue of vicarious liability.

12

13   _____

14   [6] Much of UBC's briefing is devoted to whether or not it had sufficient control over IPS's
     activities to support the existence of an agency relationship.  (*See* SJ Mot. at 9-13.)  However,
15   the extent of UBC's control over IPS is largely irrelevant for purposes of analyzing either
     implied actual agency or apparent agency.  *See Agristor Leasing v. Bertholf*, 753 F. Supp. 881,
16   890-91 (D. Kan. 1990) (". . . [W]ith both implied actual authority and apparent authority, it is the
     principal's action of furthering or allowing an appearance of authority—not the actual ability to
17   control the agent – which is key.").  Further, the court is unconvinced by UBC's reliance on
     *Anderson v. Domino's Pizza, Inc.*, No. 11-cv-902 RBL, 2012 WL 1684620 (W.D. Wash. May
18   15, 2012).  (*See* SJ Mot. at 11-12.)  In *Anderson*, the court found that Domino's Pizza was not
     vicariously liable for the actions of one of its franchisees in a marketing campaign that utilized
19   automatic dialing and announcing devices because although Domino's Pizza required the
     franchisee to use a system that was capable of producing lists for automatic dialing and
20   answering device calling, it did not direct the franchisee to make the calls.  *Id.* at *4.  There is no
     indication, however, that the parties or the court considered implied actual authority or apparent
21   authority in that decision or that there were facts that would put these theories of agency into
     play.  *See id.*  The same is true of *Thomas v. Taco Bell Corp.*, --- F. Supp. 2d ---, 2012 WL
22   3047351, at *5-*6 (C.D. Cal. 2012), which is a decision arising under the Telephone Consumer
     Protection Act, 47 U.S.C. § 227.  (*See* UBC's Not. of Supp. Auth. (Dkt. # 73).)

### 3. Statutory Damages

With respect to damages, the WADAD provides:

> It shall be presumed that damages to the recipient of commercial solicitations made using an automatic dialing and announcing device are five hundred dollars.

RCW 80.36.400(3).  UBC asserts that because Washington's Legislature referred to damages under the Act as "presumed," UBC may rebut the "presumption" with evidence that Plaintiffs in fact incurred no actual damages as a result of IPS's telephone calls.  (*See* SJ Mot. at 14-17.)  UBC asserts that because Plaintiffs cannot establish actual damages, it has rebutted the statutory presumption and is entitled to summary judgment.  (*Id.*)  The court rejects UBC's statutory analysis, and therefore denies its motion with respect to the WADAD.[7]

UBC points to other statutory provisions to support its interpretation.  For example, RCW 80.36.390, which restricts telephone solicitations to residential telephone customers, states that "[t]he court shall award damages of at least one hundred dollars for each individual violation of this section."  RCW 80.36.390(6).  UBC argues that if the Legislature had not intended to make WADAD's "presumed" damages rebuttable, then it could have used language similar to the damages language found in RCW 80.36.390.  Likewise, in RCW 11.68.090, the Legislature stated that certain transactions of a personal

---

[7] UBC also moves for summary judgment with respect to Plaintiffs' claims for declaratory judgment and for violation of the CPA asserting that these claims should be dismissed because they rely upon Plaintiffs' WADAD claim.  (SJ Mot. at 17-18.)  Because the court denies UBC's motion with respect to Plaintiffs' WADAD claims, it also denies UBC's motion with respect to these claims.

1    representative are "conclusively presumed" to be necessary for administration of the

2    decedent's estate.  UBC argues that if the Legislature had intended for damages under the

3    WADAD to be conclusive, as opposed to rebuttable, it could have used the terms

4    "conclusively presumed" as it did in RCW 11.68.090.  (*See* SJ Mot. at 16-17.)

5         The court is unpersuaded.  First, the "WADAD is remedial in nature and should be

6    read broadly to accomplish its goal rather than narrowly with the effect of creating

7    bizarre and legislatively-unintended loopholes."  *Anderson*, 2012 WL 1684620 at *3, n.

8    2.  In most circumstances, WADAD plaintiffs would find actual damages difficult, if not

9    impossible, to prove with respect to an improper WADAD call.  For example, Plaintiffs

10   here acknowledge that the flat monthly fee their telephone service provider charges does

11   not vary depending on how many recorded phone messages they receive, and they are

12   unable to identify any other actual damages.  (*See* Sullivan Decl. (Dkt. # 43) Ex. E

13   (Hartman Dep.) at 33:10-37:25, Ex. F (Hodgin Dep.) at 33:6-35:6.)  If the presumption of

14   damages is indeed rebuttable, then most (if not all) WADAD claims would be eviscerated

15   with a just few quick deposition or interrogatory questions concerning proof of actual

16   damages.  Thus, under UBC's construction of the statute, although the Legislature

17   intended to create a WADAD cause of action, the typical recipient of improper WADAD

18   calls would be unable to state a claim or survive summary judgment because proof of

19   actual damages would be virtually impossible to establish and the statutory presumption

20   so easy to rebut.  The court rejects the notion that the Legislature intended to provide a

21   remedy with one hand only to snatch it away with the other.  If the court were to accept

22   UBC's interpretation of the WADAD damages provision, it would indeed create a

"bizarre and legislatively-unintended loophole."  The court presumes that the Legislature

did not intend such a result.  *See Olympic Tug & Barge, Inc. v. Wash. State Dep't of*

*Revenue*, 259 P.3d 338, 343 (Wash. Ct. App. 2011) ("Courts also avoid interpreting a

statute in a way that leads to an absurd result because we presume the legislature did not

intend an absurd result."); *see also Kilian v. Atkinson*, 50 P.3d 638, 640 (Wash. 2002)

("The court must also avoid constructions that yield unlikely, absurd or strained

consequences.").

        In addition, other statutory provisions involving the Legislature's use of the word

"presumed" with respect to statutory damages undermine UBC's position.  As part of the

Telephone Buyer's Protection Act, the Legislature stated:

> It shall be presumed that damages to the consumer are equal to the purchase
> price of any telephone equipment sold in violation of this chapter up to one
> hundred dollars.  Additional damages must be proved.

RCW 19.130.060.  In addition, with respect to violations of certain disclosure

requirements under the purview of the Washington Utilities and Transportation

Commission, the Legislature provided:

> It shall be presumed that damages to the consumer are equal to the cost of
> the service provided plus two hundred dollars.  Additional damages must be
> proved.

RCW 80.36.530.  The Legislature's statement that "[a]dditional damages must be

proved" in both of the foregoing provisions indicates its understanding that "presumed"

damages require no proof by the plaintiff.

        Further, despite the Legislature's use of the term "presumed" with respect to

damages in RCW 80.36.530, the Washington Supreme Court stated that the statute "set

ORDER- 17

1    the amount of damages for disclosure violations at 'the cost of service provided plus two

2    hundred dollars.'"  *Judd v. Am. Tel & Tel. Co.*, 95 P.3d 337, 339 n.3 (Wash. 2004).  The

3    Court's use of the word "set" does not lend itself to the notion that a defendant can rebut

4    "the amount of damages" after liability is established where the plaintiff lacks proof of

5    any actual damages.  With these examples in mind, the court rejects UBC's interpretation

6    of RCW 80.36.400(3) that would permit UBC to rebut the statute's presumed damages of

7    $500.00 because Plaintiffs have not sustained any actual damages.

8            **4.  Negligence**

9            UBC also asserts that it is entitled to summary judgment with respect to Plaintiffs'

10   claim for negligence because Plaintiffs have failed to establish actual harm or injury as a

11   result of UBC's alleged negligence.  (SJ Mot. at 18.)  As discussed above, except for

12   statutory damages under RCW 80.36.400(3), Plaintiffs admit that they have suffered no

13   increase in billing as a result of the calls at issue.  (*See* Sullivan Decl. Ex. E at 33:25-

14   37:25; Ex. F at 32:16-35:6.)  In addition, in response to an interrogatory question asking

15   plaintiffs to "[e]xplain in detail how you calculate damages," and "identify[] all

16   components of compensatory damages," Plaintiffs sole response was that they "calculate

17   damages based on the Washington statute which provides for $500 for each unlawful

18   call."  (*Id.* Ex. A (Hartman Resp. to Int. No. 3) & Ex. B (Hodgins' Resp. to Int. No. 3).)

19           The elements "fundamental to any negligence action" are:  (1) duty, (2) breach, (3)

20   proximate cause, and (4) resulting damage or injury.  *Harbeson v. Parke-Davis, Inc*., 656

21   P .2d 483, 489 (Wash. 1983); *Hymas v. UAP Distribution, Inc*.,  272 P.3d 889, 895

22   (Wash. Ct. App. 2012).  Unlike a statutory claim under the WADAD, "[a]ctual loss or

ORDER- 18

1   damage is an essential element in the formulation of the traditional elements necessary

2   for a cause of action in negligence." *See Gazija v. Nicholas Jerns Co.*, 543 P.2d 338, 341

3   (Wash. 1975); *see also Denny's Rest., Inc. v. Sec. Union Title Ins. Co.*, 859 P.2d 619, 631

4   (Wash. Ct. App. 1993) ("Actual harm is an essential element for a negligence action.").

5   UBC met its initial burden of showing there is no genuine issue of material fact with

6   respect to any actual harm suffered by Plaintiffs.  Plaintiffs have failed to make a

7   showing sufficient to establish a genuine dispute of material fact regarding the existence

8   of an essential element of their negligence cause of action, namely actual harm or injury.

9   Accordingly, the court grants UBC's motion for summary judgment with respect to

10  Plaintiffs' claim for negligence.

11          **5.  Standing**

12          UBC also asserts that Plaintiffs lack Article III standing under the United States

13  Constitution because they allege only statutory and not actual damages.  (*See* SJ Mot. at

14  18-19 (citing United States Constitution, Article III, § 2).)  UBC acknowledges that under

15  *Edwards v. First American Corp.*, 610 F.3d 514 (9th Cir. 2010), a violation of statutory

16  rights without actual injury satisfies Article III's injury requirement.  (*See* SJ Mot. at 19.)

17  UBC based its argument on the fact that the United States Supreme Court had granted a

18  writ of certiorari with respect to the Ninth Circuit's *Edwards* decision.  (*See id.* (citing

19  *First Am. Fin. Corp. v. Edwards*, 131 S.Ct. 3022 (2011).)  As UBC noted after the

20  parties' briefing was complete, however, the Supreme Court subsequently dismissed the

21  writ of certiorari "as improvidently granted."  (UBC's Not. of Supp. Auth. (Dkt. # 67)

22

1   (citing *First Am. Fin. Corp. v. Edwards*, 132 S.Ct. 2536 (2012).)  Accordingly, the court

2   denies UBC's motion for summary judgment on this ground.

3   **B.  Plaintiffs' Motion for Class Certification**

4   The WADAD states that "[n]o person may use an automatic dialing and

5   announcing device for purposes of commercial solicitation."  RCW 80.36.400(3).  An

6   "automatic dialing and announcing device" is defined as "a device which automatically

7   dials telephone numbers and plays a recorded message once a connection is made."

8   RCW 80.36.400(1)(a).  The statute defines "commercial solicitation" as "the unsolicited

9   initiation of a telephone conversation for the purpose of encouraging a person to purchase

10  property, goods, or services."  RCW 80.36.400(1)(b).  This court has previously held that

11  an unsolicited message placed by an automatic dialing and announcing device which asks

12  the recipient to return the call initiates a telephone conversation and therefore falls within

13  the definition of "commercial solicitation" under RCW 80.36.400(1)(b).  (Order (Dkt. #

14  34) at 7-11.); *see also Anderson v. Domino's Pizza, Inc.*, No. 11-cv-902 RBL, 2012 WL

15  1684620, at *3 (W.D. Wash. May 15, 2012); *Meillieur v. AT&T, Inc.*, No. C11-1025

16  MJP, 2011 WL 5592647, at *7 (W.D. Wash. Nov. 16, 2011).  However, a message that

17  does not initiate a conversation does not violate the WADAD.  *See Cubbage v. Talbots,*

18  *Inc.*, NO. C09-91BHS, 2010 WL 2710628, at *5 (W.D. Wash. July 7, 2010) ("[T]he

19  automated call simply provided information (albeit, a solicitation to purchase goods at

20  Talbots), without the ability of the caller or recipient of the call to engage in

21  conversation.").

22

1    Plaintiffs have moved to certify a class of "[a]ll Washington residents who

2  received one or more commercial solicitations from UBC directly or through its agents,

3  including but not limited to IPS, through the use of automatic dialing and announcing

4  devices."  (*See* Class Cert. Mot. at 1; 2d Am. Compl. ¶ 4.2.)  UBC and IPS oppose the

5  motion.  (UBC Resp. (Dkt. # 52); IPS Resp.)

6    **1.    Standards for Class Certification**

7    "Class certification is governed by Federal Rule of Civil Procedure 23."  *Wal–*

8  *Mart Stores, Inc. v. Dukes*, --- U.S. ---, 131 S.Ct. 2541, 2548 (2011).  Under Federal Rule

9  of Civil Procedure Rule 23(a), the party seeking certification must demonstrate, first,

10  that:

11    (1) the class is so numerous that joinder of all members is impracticable;
       (2) there are questions of law or fact common to the class;
12    (3) the claims or defenses of the representative parties are typical of the
       claims or defenses of the class; and
13    (4) the representative parties will fairly and adequately protect the interests
       of the class.
14
15  Fed. R. Civ. P. 23(a).  "Second, the proposed class must satisfy at least one of the three

16  requirements listed in Rule 23(b)."  *Dukes*, 131 S.Ct. at 2548.  Within the context of these

17  criteria, the ultimate decision regarding class certification involves a significant element

18  of discretion.  *Yokoyama v. Midland Nat. Life Ins. Co.*, 594 F.3d 1087, 1090 (9th Cir.

19  2010).

20    Plaintiffs contend that certification of their class is appropriate under Rule

21  23(b)(2) and (3).  (*See generally* Class Cert. Mot.)  To obtain class certification, Plaintiffs

22  bear the burden of proving that the class meets all four requirements of Rule 23(a)—

ORDER- 21

1    numerosity, commonality, typicality, and adequacy—and falls within one of the three

2    categories of Rule 23(b).  *Ellis*, 657 F.3d at 979-80.  In resolving Plaintiffs' motion, the

3    court recognizes that "Rule 23 does not set forth a mere pleading standard."  *Dukes*, 131

4    S.Ct. at 2551. "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous

5    analysis, that the prerequisites of Rule 23(a) have been satisfied.'"  *Id*. (citation omitted)

6    ("A party seeking class certification must affirmatively demonstrate his compliance with

7    the Rule—that is, he must be prepared to prove that there are in fact sufficiently

8    numerous parties, common questions of law or fact, etc.").  Moreover, because "class

9    determination generally involves considerations that are enmeshed in the factual and

10   legal issues comprising the plaintiff's cause of action," the required "rigorous analysis"

11   will itself frequently "entail some overlap with the merits of the plaintiff's underlying

12   claim."  *Id*. at 2551-52.

13       **2.   Rule 23(a) Requirements**

14       Based on the analysis below, the court concludes that Plaintiffs have established

15   the numerosity and adequacy prerequisites for class certification found in Rule 23(a), but

16   have failed to establish commonality and typicality.  *See* Fed. R. Civ. P. 23(a)(1)-(4).

17       **a.   Numerosity**

18       "The numerosity requirement requires examination of the specific facts of each

19   case and imposes no absolute limitations."  *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446

20   U.S. 318, 330 (1980).  Courts require only that the potential class be "so numerous that

21   joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Plaintiffs have

22   asserted that the total number of IPS calls to telephone numbers with Washington

1    prefixes was approximately 110,000.  (Joint. Decl. ¶ 15.)  Even assuming a portion of the

2    recipients of these calls do not qualify as class members, or that some recipients may

3    have received multiple calls, the number asserted by Plaintiffs' counsel readily meets the

4    numerosity requirement.[8]  *See Tchobian v. Parking Concepts, Inc.*, No. SACV 09-422

5    JVS (ANx), 2009 WL 2169883, at *4 (C.D. Cal. July 16, 2009) ("The fact that the size of

6    the proposed class has not been exactly determined is not a fatal defect in the motion; a

7    class action may proceed upon estimates as to the size of the proposed class.") (quoting

8    *In re Alcoholic Beverages Litig.*, 95 F.R.D. 321, 324 (D.C.N.Y. 1982)).  The sheer

9    number of potential class members justifies the court's finding that the putative class

10   satisfies the numerosity requirement.

11              **b.  Adequacy**

12        "[T]wo criteria for determining the adequacy of representation have been

13   recognized.  First, the named representatives must appear able to prosecute the action

14   vigorously through qualified counsel, and second, the representatives must not have

15   antagonistic or conflicting interests with the unnamed members of the class."  *Lerwill v.*

16   *Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978).

17

18

19        [8] The court notes that both UBC and IPS have objected to the evidence submitted by

20   Plaintiffs' counsel with respect to the numerosity element.  (*See* UBC Resp. at 6; IPS Resp. at 2
     & n.1.)  The court agrees that the evidence is not of a quality that would be admissible at trial or

21   even on summary judgment.  Nevertheless, in light of the court's ultimate ruling in this matter
     denying class certification on other grounds, it is unnecessary for the court to decide this

22   evidentiary issue.

1    The court believes that the adequacy of representation requirement under Rule

2  23(a)(4) is met here.  Plaintiffs understand the responsibilities of a class representative,

3  are prepared to assume those responsibilities, and have retained experienced counsel.[9]

4  Plaintiffs have no antagonistic or conflicting interests with the putative class members.

5  Both Plaintiffs and the putative class members seek money damages and injunctive relief

6  for UBC's and IPS's alleged unlawful actions.

7    Nevertheless, UBC asserts that because Plaintiffs seek only statutory damages

8  under RCW 80.36.400 (*see* Class Cert. Mot. at 13), Plaintiffs' interests are at odds with

9  the interests of class members who may have actual, and not just statutory, damages.

10  (UBC Resp. at 11-12.)  Consistent with its ruling on UBC's motion for summary

11  judgment (*see supra* § III.A.3), however, the court agrees with Plaintiffs that proof of

12  actual damages is not required to maintain an action under RCW 80.36.400, and that

13  Plaintiffs' claim for statutory damages in this matter adequately represents the putative

14  class's interests.[10]

15

16

17  _____

18    [9] Neither UBC nor IPS expressly challenge the adequacy of Plaintiffs' counsel for
   purposes of representing the class.

19

20    [10]Although the court believes that actual damages may be difficult to prove in these
   circumstances, the court recognizes that it is theoretically possible that some class members may
   be able to establish such damages.  The court, however, is not persuaded that the fact that some
   class members may be able to prove actual damages, while Plaintiffs claim only statutory
21  damages, renders Plaintiffs inadequate class representatives.  Rather, this issue more
   appropriately relates to the "commonality" requirement of Rule 23(a) or the "predominance"
22  requirement of Rule 23(b)(3).  (*See infra* §§ III.B.2.c, III.B.3.b.)

1            **c.   Commonality**

2           Rule 23(a) also demands "questions of law or fact common to the class."  The

3      requirement of "commonality" is met through the existence of a "common contention"

4      that is of "such a nature that it is capable of classwide resolution [.]" *Dukes*, --- U.S. ---,

5      131 S.Ct. at 2551.  "Commonality requires the plaintiff to demonstrate that the class

6      members 'have suffered the same injury.'" *Id.* (quoting *Gen. Tele. Co. of Sw. v. Falcon*,

7      457 U.S. 147, 157 (1982)).  As summarized by the Supreme Court:

8             What matters to class certification . . . is not the raising of common
              questions—even in droves—but, rather the capacity of a classwide
9             proceeding to generate common answers apt to drive the resolution of the
              litigation. Dissimilarities within the proposed class are what have the
10            potential to impede the generation of common answers.

11     *Id.* (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84

12     N.Y.U. L. Rev. 97, 132 (2009)).

13          In their opening memorandum, Plaintiffs fail to address the Supreme Court's

14     recent discussion of "commonality" in *Dukes*.  Plaintiffs also fail to specifically identify

15     any common questions capable of classwide resolution.  Instead, they assert simply that

16     they satisfy the commonality requirement because "IPS and UBC engaged in a 'common

17     course of conduct' by causing the transmission of ADAD [automatic dialing and

18     announcing devices] advertisements to tens of thousands of merchants."  (Class Cert.

19     Mot. at 11.)  This bald assertion fails to satisfy Plaintiffs' burden with respect to

20     establishing commonality.

21          UBC and IPS challenge the existence of commonality by arguing that individual

22     fact finding will be necessary with respect to each of the allegedly improper calls

1    indentified by Plaintiffs. (*See* IPS Class Cert. Resp. (Dkt. # 49) at 4; UBC Class Cert.

2    Resp. (Dkt. # 52) at 8-9.) As described above, to identify their potential class members,

3    Plaintiffs rely upon a ConnecTel spreadsheet listing certain information about IPS's

4    telephone calls. Although the ConnecTel spreadsheet purportedly identifies each call

5    made, ConnecTel's records do not show whether a message was left, or (if a message was

6    left) which message was used. If ConnecTel's platform detected that a live person was

7    answering the call, then the platform played a message that would simply apologize and

8    terminate the call. Defendants assert that such a message does not meet the statutory

9    definition of "commercial solicitation" and therefore would not violate RCW 80.36.400.

10          Defendants also assert that, with the advent and rapid spread of technology that

11   renders telephone numbers portable, it is impossible to know based on the ConnecTel

12   spreadsheet alone whether telephone numbers with Washington State prefixes were

13   actually located within Washington State at the time of IPS's calls. Defendants assert

14   that answers to the foregoing individual questions are important because they may

15   establish defenses to the individual claims of each potential class member. The court,

16   therefore, may be required to hold individualized hearings with respect to each of the

17   calls identified on ConnecTel's spreadsheet.

18          Plaintiffs do not refute these arguments but simply assert that "even if true," they

19   merely represent "common defenses for Defendants to prove." (Class Cert. Reply

20   (Dtk. # 64) at 4.) Plaintiffs miss the point. These defenses are not "common" in that they

21   can be resolved on a class-wide basis "in one stroke." *See Dukes*, 131 S.Ct. at 2551.

22   Rather, these are defenses that will require individualized hearings with respect to each

1   telephone call.  As a result, the court will need to resolve Defendants' liability with

2   respect to each potential class member on an individualized basis.

3          Plaintiffs also assert that it is irrelevant that some calls were not answered or that

4   some messages did not meet the technical definition of a "commercial solicitation"

5   because RCW 80.36.400 prohibits the "use" of an automatic dialing and announcing

6   device "for purposes of commercial solicitation."  RCW 80.36.400(2).  Plaintiffs assert

7   that Defendants admit all of the calls were made for the purpose of selling UBC's

8   products and services, and thus Defendants were using automated dialing and answering

9   devices "for purposes of commercial solicitation" irrespective of which message was

10  played.  (Class Cert. Reply at 5-6.)

11         The court, however, is unpersuaded by Plaintiffs' construction.  The statute also

12  states that "[i]t is presumed that damages to the recipient of commercial solicitations . . .

13  are five hundred dollars."  RCW 80.36.400(3).  This provision indicates that only a

14  "recipient" of a commercial solicitation is entitled to damages.  The statute defines

15  "commercial solicitation" as "the unsolicited initiation of a telephone conversation for the

16  purpose of encouraging a person to purchase property, goods, or services."  RCW

17  80.36.400(1)(b).  If some of the calls made or messages left by IPS did not meet the

18  statutory definition of a "commercial solicitation," then those individuals would not be

19  entitled to damages because they would not be "recipients" of a commercial solicitation.

20  The defenses IPS and UBC raise will require individualized hearings for each potential

21  call identified by Plaintiffs, and accordingly, the court concludes that Plaintiffs have

22  failed to establish the Rule 26(a) prerequisite of commonality.

### d.  Typicality

"[R]epresentative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).  "The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157 n.13.  Three factors go into the determination of typicality: (1) "'whether other members have the same or similar injury, [(2)] whether the action is based on conduct which is not unique to the named plaintiffs, and [(3)] whether other class members have been injured by the same course of conduct.'" *Hanon*, 976 F.2d at 508 (quoting *Schwartz v. Harp*, 108 F.R.D. 279, 282 (C.D.Cal.1985)).  Although the representative claims need not "be substantially identical" to those of absent class members, they must be "reasonably co-extensive." *Hanlon*, 150 F.3d at 1020.

For reasons similar to those discussed above with respect to commonality, the court also finds that Plaintiffs have failed to carry their burden with respect to typicality.  Although Plaintiffs have identified approximately 110,000 telephone numbers with Washington prefixes that IPS called on behalf of UBC using automated dialing and answering device, the similarity between the calls ends there.  Some putative class members answered IPS's calls with a live person, but others did not.  Some putative class members, like named Plaintiffs, answered IPS's calls with an answering machine, voice

1   mail service, or other recording device, but others did not.  Some putative class members

2   presumably received the same message as Plaintiffs.  Others did not.  Some potential

3   class members, like Plaintiffs, may have received messages that met the definition of

4   "commercial solicitation," but others did not.  Some potential class members, like

5   Plaintiffs, received a call from IPS while they were located in Washington State, but

6   others presumably did not.  The problem is obvious:  determining which of IPS's calls on

7   behalf of UBC violated RCW 80.36.400 requires individualized evidence and analysis.

8   Under these circumstances, the court cannot find the Plaintiffs have established

9   typicality.

10          **3.  Rule 23(b) Requirements**

11          In addition to Plaintiffs' failure to satisfy the Rule 23(a) prerequisites of

12   commonality and typicality, the court also is not satisfied that Plaintiffs have met the

13   requirements for class certification under either Rule 23(b)(2) or Rule 23(b)(3).

14                  **a.  Rule 23(b)(2)**

15          A class may be certified under Rule 23(b)(2) if "the party opposing the class has

16   acted or refused to act on grounds generally applicable to the class, thereby making

17   appropriate final injunctive relief or corresponding declaratory relief with respect to the

18   class as a whole."  Fed. R. Civ. P. 23(b)(2).  Plaintiffs assert that "Defendants used an

19   automated dialing and announcement [sic] device to send a pre-recorded message to

20   telephones of persons in Washington for solicitation purposes," and "Plaintiffs and the

21   Class are entitled to have their rights, status and legal relations relating to Defendants'

22

1    use of an automatic dialing and announcing device established by th[e] Court."  (2d. Am.

2    Complaint ¶¶ 7.2-7.3.)

3            The court agrees with UBC and IPS that certification under Rule 23(b)(2) is not

4    appropriate.  In their motion for class certification, Plaintiffs ignore the Supreme Court's

5    recent decision in *Dukes*, which disapproves class certification under Rule 23(b)(2) for

6    claims involving monetary relief, at least where the claim for money damages is "not

7    incidental" to the injunctive or declaratory relief.  *Dukes*, 131 S.Ct. at 2557 ("We now

8    hold that [claims for monetary relief] may not [be certified under Rule 23(b)(2)], at least

9    where (as here) the monetary relief is not incidental . . . .").[11]  In *Dukes*, the Supreme

10   Court referenced the Fifth Circuit's definition of "incidental" in *Allison v. Citgo*

11   *Petroleum Corp.*, 151 F.3d 402 (5th Cir.1998).  *See Dukes*, 131 S.Ct. at 2560.  In *Allison*,

12   the Fifth Circuit stated that "[l]iability for incidental damages should not require

13   additional hearings to resolve the disparate merits of each individual's case; it should

14   neither introduce new and substantial legal or factual issues, nor entail complex

15   individualized determinations."  151 F.3d at 415.  Rather, incidental damages should be

16   "by definition, more in the nature of a group remedy."  *Id.*

17   _____

18       [11]As the Supreme Court explained, under Rule 23(b)(2), "the relief sought must perforce
     affect the entire class at once."  *Dukes*, 131 S.Ct. at 2257.  For this reason a Rule 23(b)(2) class
19   is mandatory, provides no opportunity for class members to opt out, and does not oblige the court
     to afford class members notice of the action.  *Id.*  Rule 23(b)(3), however, was designed for
20   situations "in which class treatment is not as clearly called for."  *Id.* (citing *Amchem Prods., Inc.
     v. Windsor*, 521 U.S. 591, 615 (1997) (internal quotations omitted)).   Thus, Rule 23(b)(3) allows
21   for class certification in much wider circumstances, but with corresponding greater procedural
     protections as well, including predominance, superiority, mandatory notice, and the right to opt
22   out of the class.  *Id.*

1    Here, Plaintiffs have failed to establish that their claims for damages are

2   "incidental" to their request for injunctive relief.[12]  Although the court agrees that proof

3   of actual injury is not required under RCW 80.36.400, and named Plaintiffs seek only

4   statutory damages, Plaintiffs have not disavowed the possibility of actual damages with

5   respect to putative class members.  (*See* Class Cert. Reply (Dkt. # 64) at 7 (contention

6   that Plaintiffs have abandoned class claims for actual damages "is absurd and

7   unsupported by the evidence").)  Thus, it may be necessary to hold individualized

8   hearings with respect to actual damages for at least some putative class members.

9    More importantly, however, even an award of statutory damages here would

10   "require additional hearings to resolve the disparate merits of each individual's case."

11   *Allision*, 151 F.3d at 415.  In order to identify their putative class members, Plaintiffs

12   _____

13    [12]The court also notes that it is undisputed that IPS stopped using automatic dialing and
    announcing devices in June or July of 2010—more than a year before Plaintiffs sued IPS and
14   joined it as a defendant in this action, and that UBC has never directly utilized such devices.
    (Sullivan Decl. Ex. C (Shoger Dep.) 45:11-25; Verification of St. Ct. Records (Dkt. # 9-3) at 59-
15   78; Ward Decl. (Dkt. # 44) ¶ 13; Jones Decl. (Dkt. # 45) ¶ 11.)  Further, IPS has stated that it has
    no plans to resume the practice (Shoger Decl. (Dkt. # 50) ¶ 2), and Plaintiffs have acknowledged
16   that UBC and IPS "have stopped sending pre-recorded messages to the telephones of businesses
    in Washington . . . ." (Class Cert. Mot. at 5).  These facts do not mean that Plaintiffs' claim for
17   injunctive relief is moot.  *See Knox v. Serv. Emps. Int'l Union, Local 1000*, --- U.S. ---, 132 S.Ct.
    2277, 2287 (2012) ("The voluntary cessation of challenged conduct does not oridinarily render a
18   case moot because a dismissal for mootness would permit a resumption of the challenged
    conduct as soon as the case is dismissed.")  They do, however, raise serious questions regarding
19   whether Plaintiffs, including putative class members, would be willing to pursue this litigation
    absent any prospect of damages recovery, and thus whether their claims for damages can be
20   considered truly incidental to their claims for injunctive relief.  *See Rowe v. Bankers Life & Cas.
    Co.*, No. 09-cv-491, 2012 WL 1068754, at *6 (N.D. Ill. Mar. 29, 2012) ("[T]he Court questions
21   whether [Plaintiff's] inclusion of injunctive claims was simply a creative 'effort to make [her]
    case more amenable to class certification. . . .") (quoting *Kartman v. State Farm Mut. Auto. Ins.
    Co.*, 634 F.3d 883, 889 (7th Cir. 2011) (suggesting that the plaintiff called for an injunction to
22   give itself "a fallback position on the class-certification question")).

ORDER- 31

1  subpoenaed and obtained a spreadsheet of all calls that IPS placed through ConnecTel's

2  platform.  (Supp. Peralta Decl. ¶ 12.)  Plaintiffs have alleged that approximately 110,000

3  calls listed on this spreadsheet were made to telephone numbers with a Washington State

4  prefix.  (*See* Joint Decl. ¶ 15.)  However, based on the spreadsheet alone, there is no way

5  to determine a number of dispositive issues with respect to each putative class member's

6  right to an award of statutory damages.

7       First, there is no way to determine from the spreadsheet alone whether a call was

8  answered by a person or a machine.  (Supp. Peralta Decl. ¶¶ 10, 12.)  If a call was not

9  answered, Defendants could not have left a message constituting a "commercial

10  solicitation" under RCW 80.36.400.

11       Second, if the call was answered, there is no way to determine from the

12  spreadsheet alone which message IPS played.  (*Id.* ¶¶ 10, 12, Sullivan Decl. Ex. C 30:21-

13  31:8; 32:10-20; 33:4-34:10.)  Some of the messages that IPS left may not have

14  constituted a "commercial solicitation."  For example, if ConnecTel's platform predicted

15  that a live person would answer the telephone, then the message that IPS played simply

16  apologized and terminated the call.  (*Id.* at 33:4-34:10.)  This message would not

17  constitute a "commercial solicitation" in violation of the statute because it would not

18  constitute the "initiation of a telephone conversation" as required under RCW

19  80.36.400(b).

20       Finally, there is no way, based on the spreadsheet alone, to determine if

21  Defendants' calls to telephone numbers with Washington prefixes were made to

22  telephones physically located in Washington.  (*See* Shoger Decl. ¶ 2; Sullivan Decl.

1    Ex. C (Shoger Dep.) 45:11-25.)  Given the proliferation of mobile phone technology, the

2    court recognizes that telephone numbers are no longer tethered to a specific geographic

3    locale but can transported to virtually anyplace in the world.  The necessity of

4    individualized hearings with respect to these issues prevents the court from finding that

5    the putative class members' claim for damages is "incidental" to their claim for

6    injunctive relief.  Accordingly, the court denies Plaintiffs' motion for class certification

7    under Rule 23(b)(2).[13]

8               **b.   Rule 23(b)(3)**

9         Plaintiffs also seek class certification under Rule 23(b)(3).  Class certification is

10   appropriate under Rule 23(b)(3) when "questions of law or fact common to class

11   members predominate over any questions affecting only individual members, and that a

12   class action is superior to other available methods for fairly and efficiently adjudicating

13   the controversy."  Fed. R. Civ. P. 23(b)(3).  For the same reasons stated above with

14   respect to commonality, typicality, and certification under Rule 23(b)(2), the court

15   concludes that individual questions will predominate in this lawsuit.  As noted above,

16   individualized hearings will be required with respect to each of the calls at issue to

17   determine (1) whether the particular call at issue was answered, (2) whether a recorded

18

19

20          [13] The court notes that it may be possible for Plaintiffs to seek class certification under
     Rule 23(b)(2) of only their claim for injunctive relief.  *See In re Apple and AT&T iPad Unlimited
     Data Plan Litig.*, No. C-10-02553 RMW, 2012 WL 2428248, at *8 (N.D. Cal. June 26, 2012)
21   ("[T]here appears to be no bar to plaintiff seeking certification under Rule 23(b)(2) of a class
     pursuing only class-wide injunctive relief, regardless of how other claims in this case are
22   treated.").  Plaintiffs, however, have not raised this possibility, and absent thorough briefing by
     the parties, the court declines to consider and rule on this issue.

ORDER- 33

1    message was left, (3) if a recorded message was left, which message was played, and (4)

2    was the telephone physically located in Washington State at the time the call was

3    received and/or the recorded message left.  These issues, and their resolutions, are critical

4    to the determination of Defendants' liability with respect to each call, but are not issues

5    that may be resolved on a classwide basis.  Accordingly, the court denies Plaintiffs'

6    motion to certify their putative class action under Rule 23(b)(3).

7                              **IV.     CONCLUSION**

8           Based on the foregoing, the court GRANTS in part and DENIES in part Defendant

9    UBC's motion for summary judgment (Dtk. # 42) and DENIES Plaintiffs' motion for

10   class certification (Dkt. # 36).

11          Dated this 4th day of October, 2012.

12

13

14   _____

15   JAMES L. ROBART
     United States District Judge

16

17

18

19

20

21

22